**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Office of Human Rights



**Judiciary Square Office**
441 4th Street, NW, Suite 570N
Washington, DC 20001
Phone: (202) 727-4559  Fax: (202) 727-9589

**Penn Branch Office**
3220 Pennsylvania Avenue, SE, 1st Fl.
Washington, DC 20020
Phone: (202) 727-4559  Fax: (202) 645-6390

# LETTER OF DETERMINATION

July 19, 2006

Law Offices
Janis, Schuelke & Wechsler
Attn.: J. Thomas Spiggle, Esq.
Re: Ms. Vivian M. Woods
1728 Massachusetts Avenue, N.W.
Washington, DC 20036

**RE:**   *Vivian M. Woods vs. Eagle Technologies, Inc.*
         **Docket No.: 05-267-P (N)**

Dear Ms. Woods:

The Office of Human Rights (the "OHR") has completed its investigation of the above-captioned complaint. You are referred to as "**COMPLAINANT**." Eagle Technologies, Inc. is referred to as "**RESPONDENT**." Complainant's charge presented the following issues, which the OHR investigated.

## ISSUES PRESENTED

I.   Whether Respondent unlawfully denied Complainant the benefits of the District of Columbia Family and Medical Leave Act ("DCFMLA" or "FMLA") when Respondent allegedly terminated Complainant's employment on September 24, 2004, after Complainant: 1) requested FMLA Leave in late July and early August 2004, reiterating her request in writing on August 11, 2004; 2) furnished Respondent's Project Manager with documentation for her FMLA Leave on August 27, 2004, upon his request on the prior day; and 3) left work from August 30-September 30, 2004 (temporarily returning on September 24, 2004) to care for her mother, calling her Supervisor on September 9, 10, and 17, 2004 to update him on her leave status and to inform him that she would not be able to return until September 30, 2004.

II.  Whether Respondent subjected Complainant to disparate treatment on the basis of family responsibilities (caring for mother) when Respondent allegedly

Case 1:06-cv-00695-RMC   Document 13-2   Filed 08/01/2006   Page 2 of 20

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 2 of 21

terminated Complainant's employment on September 24, 2004, after Complainant requested FMLA Leave to care for her mother in late July and in early August 2004 and left work from August 30, 2004-September 30, 2004 (temporarily returning on September 24, 2004) for this purpose.

## JURISDICTION

Respondent is a security and protection services firm that provides armed and unarmed security officers, background investigations, and training support services to the federal government, commercial, and private sector industries.[1] Respondent maintains a presence at 300 East Street, S.W., Washington, DC 20546. Respondent is not exempt for any known reasons from the laws prohibiting unlawful discrimination in the District of Columbia ("D.C.") and, thus, is subject to the enforcement jurisdiction of the OHR.

## FINDINGS OF FACT

The OHR obtained its findings of fact from: 1) Complainant's sworn complaint and additional documentation, including an addendum to her complaint and supporting documents; 2) Respondent's Position Statement and additional documentation, including its applicable Policies, Affidavits, etc.; 3) Respondent's responses to the OHR's Request for Documents; and 4) Complainant's Rebuttal. On the basis of its investigation, the OHR makes the following findings of fact.

Complainant alleges that Respondent hired her as a Personnel Security Assistant in May 2003. Complainant asserts that she worked full-time from May 2003 until Respondent terminated her employment on September 24, 2004. Before her termination, Complainant insists that she was a reliable Employee whom Respondent did not reprimand, or otherwise discipline.

Complainant avers that her mother suffers from numerous illnesses and, until August 2004, resided in an assisted living facility in D.C. However, in late July or early August, Complainant avows that it was determined that her mother would leave the assisted living facility in which she was residing to move with family in South Carolina. Complainant claims that her mother's psychologist, among others, concluded that she (Complainant) would need to assist her mother with the transition or move to South Carolina.

Soon after she learned that her mother needed assistance with re-locating, i.e., around late July or early August 2004, Complainant contends that she spoke to her, i.e., Respondent's, Project Manager to request leave for this purpose. Complainant declares that Respondent's Project Manager replied that "he would get back to...[Complainant]." However, Complainant maintains that because Respondent's Project Manager failed to respond to her in a timely manner, she sent him a written request for leave on August 11, 2004.

---

[1] The OHR obtained this information from http://www.etisecurity.com/.

Case 1:06-cv-00695-RMC   Document 13-2   Filed 08/01/2006   Page 3 of 20

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 3 of 21

Next, Complainant relates that on or about August 19, 2004, Respondent's Project Manager told Complainant that Respondent's Vice President for Quality Assurance said that Complainant "absolutely could not" take leave. Shortly after[2], Complainant states that she e-mailed her Supervisor[3] and Respondent's Senior Management, again requesting leave under the FMLA beginning on August 30, 2004 and indicating that she would be willing to work with Respondent's Management to schedule leave.

Complainant stresses that during this course of events, Respondent did not notify her of her leave rights under the FMLA. Only in late August, through her own research, did Complainant learn of her rights under the FMLA.

Moreover, on August 26, 2004, Complainant alleges that she attended a Staff Meeting with Respondent's Security Chief and informed him that she needed to take leave beginning on August 31, 2004. Complainant asserts that soon after this Meeting, she spoke with Respondent's Project Manager regarding her leave. Complainant contends that at this time, Respondent's Project Manager requested documentation of her mother's illness and also assured her that Respondent would approve her leave upon receiving such documentation. Immediately thereafter, Complainant insists that she documented this conversation in a Memorandum, dated August 26, 2004, to Respondent's Management, namely its President and Chief Executive Officer ("CEO") and its Vice President for Quality Assurance in which she: cited the FMLA; noted that she would furnish Respondent with medical records on the following day; and requested two (2)-week leave beginning on August 31, 2004, with an option to extend leave, if necessary.[4]

On the following day, August 27, 2004, Complainant asserts that she furnished Respondent's Project Manager with the requested documentation, which she obtained from her mother's psychologist, forwarding the same to Respondent's Senior Management, along with a cover letter.[5] Complainant submits the documentation regarding her mother's condition, with which she provided Respondent, to the OHR record. The documentation reflects that Complainant's mother (also the "Patient") suffers from: a "Major Depressive Disorder, [r]ecurrent, [s]evere; Hepatitis with Jaundice and compressed liver functioning; Arthritis in her knees, which impairs her ability to walk and climb steps without assistance of a cane; and Schizophrenia," among other ailments.

Further, the document indicates that the Patient's condition renders her permanently incapacitated. As a result, the document provides that the Patient: 1) will be ongoing treatment for the remainder of her life, requiring "regular psychiatric and medical follow[-]up with, at [a] minimum, monthly visits to each of her [medical] providers" and 2) requires assistance with her transportation, because of limited mobility, and with

---

[2] On the same day.
[3] Complainant's submissions, namely her termination letter, reveal that this individual is also Respondent's Vice President for Quality Assurance.
[4] Complainant includes this Memorandum in her submissions to the OHR record.
[5] Complainant documents that she submitted the requested documentation to Respondent's Management, namely its President and CEO, in a follow-up Memorandum, dated August 27, 2004.

Case 1:06-cv-00695-RMC   Document 13-2   Filed 08/01/2006   Page 4 of 20

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 4 of 21

navigating the complex system of obtaining her medical and disability benefits, ensuring that they are transferred to South Carolina. The document additionally discloses that the Patient is re-locating to South Carolina, and will establish a treatment regimen with her treating physician(s) there.

In light of the foregoing, the document states that "her daughter's [i.e., Complainant's] presence is required to ensure that...[the Patient] transitions into necessary and appropriate medical supervision." As such, the document provides that Complainant's presence "definitely will provide psychological comfort to the Patient[,] which is essential to her [i.e., the Patient's] successful transition and to prevent [a] relapse." The document finally states that even though the Patient will have caregivers during the initial 30 days, the Patient will require intermittent care thereafter from Complainant as the Patient's health deteriorates, or as "specific medical issues [may] arise."

Also, Complainant emphasizes that on several occasions in August 2004, she spoke with her Supervisor, the liaison between Respondent and its Client, for whom it provided services. Complainant notes that her Supervisor's Supervisor was also made aware that Complainant was trying to arrange to take leave from work in September 2004.

Further, Complainant avers that she was scheduled to attend a meeting with her mother in South Carolina, on Tuesday, August 31, 2004. Complainant avows that she initially planned to leave work on that Monday night, on August 30, 2004. However, Complainant claims that she began to plan her trip the day before, on Sunday, August 29, 2004, and realized that she could not leave as planned, on Monday night, and arrive in South Carolina in time to attend the meeting with her mother on Tuesday, August 31, 2004. As a result, Complainant contends that she called Respondent that Sunday evening and left a message explaining that she would be unable to attend work on Monday, August 30, 2004. Complainant reasons that such conduct complied with Respondent's Policy, which required four (4)-hours notice if an employee was unable to make her shift.

On August 30, 2004, Complainant declares that she left D.C. for South Carolina with her mother. Complainant stresses that she called Respondent's Project Manager on September 9 and 10, 2004 to update him on her leave status and to inform him that she needed her full 30-day leave, as she previously requested.[6] However, Complainant insists that no member of Respondent's Staff returned her call. Complainant maintains that when she finally reached Respondent's Project Manager on September 17, 2004, she informed him that she planned on returning to work on September 30, 2004. Rather than going to her worksite in D.C., Complainant states that Respondent's Project Manager instructed her to report to Respondent's Headquarters in Maryland.

Due to problems with her residence, Complainant relates that she needed to temporarily return to D.C. during the third week of September 2004. Complainant alleges that as instructed, she reported to Respondent's Headquarters on September 23, 2004, but was unable to speak with one (1) of Respondent's Managers. Upon returning to Respondent's

---

[6] Complainant submits to the OHR record her phone records, which document the occurrence of these calls.

Case 1:06-cv-00695-RMC   Document 13-2   Filed 08/01/2006   Page 5 of 20

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 5 of 21

Headquarters on the next day, September 24, 2004, Complainant asserts that she spoke to Respondent's Vice President for Quality Assurance who called her into his office and furnished her with a letter of termination, dated September 22, 2004, as well as a letter from Respondent's President and CEO that acknowledged and concurred with Complainant's termination. Complainant includes both of these letters as part of her submissions to the OHR record. In her termination letter, Respondent's Vice President for Quality Assurance acknowledges, and does not dispute, Complainant's position, as provided above.

On the other hand, the OHR record discloses only two (2) factual differences between Complainant's termination letter from Respondent and her position, as illustrated above. First, in Respondent's termination letter to Complainant, Respondent's Vice President for Quality Assurance does not acknowledge that Complainant requested leave to handle an "extremely serious and vital family medical situation" until August 11, 2004. This statement runs somewhat contrary to Complainant's statement above that she first requested leave (orally) in late July or early August 2004 (although Complainant did not submit a written request until the date when Respondent states, August 11, 2004). Second, in her termination letter, Respondent's Vice President for Quality Assurance does not state a precise date when Complainant called after her initial trials on September 9 and 10, 2004. Rather, Respondent's Vice President for Quality Assurance merely states that Respondent's Project Manager informed him on September 21, 2004 that he had spoken with Complainant, without mentioning the date on which Complainant spoke with Respondent's Project Manager (September 17, 2004, according to Complainant).

Nonetheless, in its termination letter to Complainant, Respondent's Vice President for Quality Assurance charges Complainant with "willfully and blatantly failing to follow [Respondent's] established [P]olicies and [P]rocedures, specifically...failing to report for work and failing to notify...[her] Supervisor for more than two (2) days." More specifically, the letter provides that Complainant was a "No Call/No Show" for the entire week of September 13-17, 2004. The letter additionally states that Complainant failed to follow the Procedures of the FMLA of 1993.

In addition, in a later conversation with Respondent's Vice President for Quality Assurance, Complainant claims that he provided her with a copy of the FMLA, said that she was fired, and stated that Respondent's Project Manager had submitted memoranda to him alleging that she had been absent from work without leave. However, Complainant concedes that Respondent's Vice President for Quality Assurance also stated that if another position with Respondent were to become available, he would rehire her, should she opt to apply. Complainant reiterates that in her termination letter, dated September 22, 2004, from Respondent's Vice President for Quality Assurance, Respondent's Vice President for Quality Assurance does not substantively dispute any of the facts in her position above.

Case 1:06-cv-00695-RMC   Document 13-2   Filed 08/01/2006   Page 6 of 20

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 6 of 21

## II.   RESPONDENT'S POSITION

In its Position Statement, Respondent chronicles the pertinent facts that it considers relevant to Complainant's charge(s). On August 11, 2004, Respondent alleges that Complainant requested medical leave of thirty (30) days to be with her mother. However, Respondent asserts that Complainant furnished it with no documentation of her mother's illness. As a result, Respondent reasons that it denied Complainant's request.

Next, on August 19, 2004, Respondent avers that Complainant e-mailed one (1) of its Officials, stating that she needed to request extended leave for consecutive periods under the FMLA and furnishing a copy of the FMLA with Respondent on the next day, August 20, 2004. On August 26, 2004, Respondent avows that Complainant e-mailed its President and CEO to request two (2) weeks of leave under the FMLA. Respondent concedes that Complainant furnished it with medical documentation for her mother's illness.

Moreover, Respondent contends that on August 30, 2004, Complainant was scheduled and agreed to work. Notwithstanding, Respondent emphasizes that Complainant failed to show and called late, leaving a voice message. Respondent stresses that Complainant did not call again until the following day, August 31, 2004.

On a related note, Respondent declares that Complainant failed to both report to work and call in to confirm her absence from September 1 through 9, 2004. Respondent insists that Complainant took her leave on her own initiative without Respondent having confirmed its approval of her requested leave. Respondent maintains that at no time did Complainant provide thirty (30 days) advance notice of her need to take foreseeable leave, along with the necessary medical documentation.

Lastly, Respondent argues that it terminated Complainant's employment on September 22, 2004 because she failed to report for work after assuring her Supervisor that she would be there. Respondent notes that Complainant has no right of appeal and that its Vice President made the final decision to discharge Complainant. Respondent alleges that its employees learn the contents and rules of its business through its new hire orientation at their respective job sites.[7]

In response to the OHR's Request for Documents, Respondent furnishes the OHR with documentation of other employees whom it decided to terminate for allegedly committing the same or substantially similar offenses. Respondent documents that it terminated the employment of one (1) of its Armed Security Guards on September 9, 2005 for sleeping on duty twice. Respondent further substantiates the termination of another Armed Security Guard, occurring on September 13, 2005, for violating Respondent's Policies when he exhibited unprofessional conduct, such as using threatening or otherwise abusive and disrespectful language toward a member of

---

[7] Respondent buttresses the foregoing allegations with Affidavits from its: Secretary, Project Manager, Vice President for Quality Assurance, and President and CEO.

Case 1:06-cv-00695-RMC   Document 13-2   Filed 08/01/2006   Page 7 of 20

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 7 of 21

Respondent's Personnel. Respondent, in addition, documents that it terminated the employment of a third Armed Security Guard on September 21, 2005 for neither calling nor showing since September 11, 2005.

### III.    RESPONDENT'S POLICIES

Respondent submits to the OHR record its "Performance of Duty" SOP ("SOP"), which sets forth the following Policies applicable to Complainant's charge. First, Respondent's SOP contains "Policy Concerning Illness/and Calling Off" provides that Respondent's personnel who fail to both report to duty on time and notify their supervisors within four (4) hours in advance "must have a bonifide emergency in order to be excused" (sic). Respondent's SOP also includes a Violations Section, which states that an employee's failure to report to work and not notify his/her supervisor for one (1) day may result in suspension (three (3)- five (5) days) for the first offense and dismissal for the second offense. This Section further states that an employee's failure to report for work and not notify his/her supervisor for two (2) days may result in dismissal on the first offense. Lastly, Respondent's SOP sets out a Section that provides that Respondent's employees who believe that Respondent wrongly disciplined them may appeal Respondent's action, such as requesting the next level in the chain of command to resolve the dispute between the employee and his/her first level supervisor.

### IV.    COMPLAINANT'S REBUTTAL

As part of her Rebuttal to Respondent's allegations, Complainant furnishes the OHR with a Rebuttal document and a "Legal Memorandum" to supplement her Rebuttal. Complainant argues the following in her Rebuttal to Respondent's position above. Generally, Complainant regards Respondent's decision to terminate her employment as discriminatory because this act occurred as a result of her taking unpaid family-medical leave to care for her sick mother. Complainant stresses that she informed Respondent more than one (1) month in advance that she needed to assist her mother in relocating to South Carolina. On multiple occasions, Complainant emphasizes that she indicated to Respondent's Officials her willingness to be flexible with leave dates. Notwithstanding, Complainant asserts that Respondent failed to acknowledge her right to unpaid family-medical leave until three (3) days before she took this leave. At this time, Complainant avers that her Supervisor requested medical documentation and informed her that Respondent would approve her leave upon receipt of her medical records. Complainant reiterates that she furnished Respondent with the requested medical records on the following day, August 27, 2004. Complainant specifically responds to each of Respondent's allegations as follows.

First, Complainant agrees that on August 11, 2004, she requested thirty (30) days worth of medical (family) leave to care for her seriously ill mother. However, Complainant emphasizes that this was her second request for such leave. Complainant asserts that at some point in July, she orally requested family-medical leave from her Supervisor. Complainant stresses that she was not required to furnish Respondent with medical documentation without a request from Respondent. Thus, Complainant reasons that

Case 1:06-cv-00695-RMC   Document 13-2   Filed 08/01/2006   Page 8 of 20

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 8 of 21

because her Supervisor did not request such documentation when she initially made her oral request, she did not furnish Respondent with this documentation at that time. Complainant avers that had her Supervisor requested this documentation, she would have provided Respondent with the requested documentation, as she did on August 26, 2004, when Respondent finally requested such documentation.

Second, Complainant concurs that on August 19, 2004, her Supervisor informed her that Respondent's Upper Management denied her request for leave. However, Complainant indicates that her Supervisor did not state why Respondent denied her request. Thereafter, Complainant claims that she e-mailed her Supervisor and Respondent's Senior Management again to request family-medical leave, noting that she could negotiate the dates of her leave. Complainant, however, contends that Respondent did not respond to her request. On the other hand, Complainant concedes that she e-mailed Respondent's Senior Management again on August 20, 2004 to request two (2) weeks of leave, with the option to extend leave, if necessary.

Third, on August 26, 2004, Complainant concurs that her Supervisor requested medical documentation of her mother's illness. Complainant declares that her Supervisor ensured her that Respondent would approve her leave upon furnishing it with the requested documentation. Complainant maintains that she provided Respondent with such requested documentation on the next day, August 27, 2004.

Fourth, Complainant concurs that she was scheduled to work on August 30, 2004. However, on August 29, 2004, when she realized that she would be unable to work the following day, August 30, 2004, Complainant insists that she called Respondent and left a message. Consistent with Respondent's Policy, Complainant stresses that she left this message more than four (4) hours before her shift.

On a related note, Complainant also agrees that Respondent's Management had known for weeks that she needed to take leave in early August to care for her ill mother. In fact, Complainant stresses that Respondent had more than one (1)-month notice that she needed to take leave beginning on August 31, 2004, at the latest, as she had informed Respondent orally of her need to take leave in late July 2004. Consequently, Complainant states that Respondent cannot dispute that she notified Respondent that she needed to take leave, rather, Complainant relates that Respondent is only complaining that she took leave one (1) day early, even though she gave Respondent notice of her absence on this day.

Fifth, Complainant agrees that after taking leave on August 30, 2004, she called her Supervisor on September 9 and 10, 2004 to "check-in." However, Complainant insists that her Supervisor did not respond to her calls. Complainant notes that Respondent signed a verification-of-employment form in late September so that she could obtain a lease on a new apartment.

Sixth, Complainant disagrees with Respondent's statement that she failed to provide it with thirty (30) days notice regarding her need to care for her sick mother. On the

Case 1:06-cv-00695-RMC    Document 13-2    Filed 08/01/2006    Page 9 of 20

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 9 of 21

contrary, Complainant reiterates that she spoke with her Supervisor about taking leave to care for her ill mother before August 11, 2004, i.e., in late July, one (1) month before her proposed leave date, August 31, 2004. Complainant notes, however, that she does not recall the precise date of this conversation. Nonetheless, Complainant reiterates that she furnished Respondent with her first written leave request on August 11, 2004, thereafter making numerous other written requests for leave.

Lastly, Complainant disagrees with Respondent's statement that it terminated her employment on September 22, 2004 because she allegedly failed to report to work after assuring her Supervisor that she would do so. Rather, Complainant alleges that Respondent terminated her employment on September 24, 2004 and, on that day, Respondent provided her with a letter dated September 22, 2004 confirming her termination. Complainant insists that this letter documents Respondent's repeated failure to respond to her request for unpaid family-medical leave. Complainant asserts that the letter further documents Respondent's failure to suggest leave time different from the dates she proposed. Complainant stresses that she took leave because she believed that Respondent's Project Manager assured her that Respondent would approve her leave after she fulfilled its request of providing medical documentation for her mother's condition.

In her "Legal Memorandum," Complainant analyzes the legal implications of her complaint. Although the OHR subsequently evaluates these implications in the Section of this Letter entitled "Legal Analysis" below, the OHR acknowledges the material facts that Complainant analyzes in relation to law she considers applicable to her claim(s).[8] Firstly, Complainant alleges that she provided Respondent with more than 30 days notice before she began her leave. Secondly, Complainant asserts that Respondent failed to respond to Complainant's requests regarding its approval of her leave request. Thirdly, Complainant avers that Respondent failed to furnish Complainant with information concerning her options for family-medical leave, e.g., via posting the DCFMLA or FMLA, or both.

**STANDARD OF REVIEW**

In this forum, for Complainant to prevail, the OHR record must contain credible, probative and substantial evidence from which a reasonable person would conclude that Complainant met the *prima facie* elements of discriminatory or retaliatory behavior, and that a legitimate, nondiscriminatory or non-retaliatory explanation for the behavior does not exist. *4 DCMR § 715.1; 4 DCMR § 499.1.*

**LEGAL ANALYSIS**

Complaints filed pursuant to the DCHRA must be filed within one (1) year of the occurrence or discovery of an unlawful discriminatory practice. D.C. Official Code § 2-

---

[8] Complainant mentions most of or all of these facts above in either Section "I." or Section "III." of "Findings of Fact."

Case 1:06-cv-00695-RMC   Document 13-2   Filed 08/01/2006   Page 10 of 20

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 10 of 21

1403.4 (2001 Edition). *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 399 (D.C. 1991). "A discrete retaliatory or discriminatory act[, such as a 'termination, failure to promote, denial of transfer, or refusal to hire'] 'occurred' on the day that it 'happened." *Amtrak v. Morgan*, 536 U.S. 101, 110 (2002).

The OHR finds that Complainant timely filed her complaint. The OHR record indicates that she filed her complaint on May 31, 2005. As such, any alleged discriminatory acts must have occurred between May 31, 2004 and May 31, 2005. According to Complainant, the earliest of these act(s) occurred on or around September 24, 2004, thus falling within the applicable statutory period. Therefore, the OHR regards Complainant's complaint as timely.

I.   **RESPONDENT DID NOT UNLAWFULLY DENY COMPLAINANT THE BENEFITS OF THE DCFMLA.**

The FMLA is designed to protect the employment benefits and seniority of an employee who takes medical leave." *Harrison v. Children's National Medical Center*, 678 A.2d 572 (D.C. 1996). It applies to employers who employ twenty (20) or more employees in the District of Columbia. D.C. Official Code § 32-515 (2001 Ed.). An employee is eligible for the benefits of the DCFMLA when the employee has worked 1,000 hours or more during the twelve (12)-month period immediately preceding the request. D.C. Official Code § 32-501 (2001 Ed.). The DCFMLA provides eligible employees with a total of 16 workweeks of medical leave during any 24-month period when an employee becomes unable to perform the functions of his or her position due to a serious health condition for as long as the employee is unable to perform the functions of his or her position. D.C. Official Code § 32-503 (2001 Ed.).

The DCFMLA does not require an employer to provide paid family or medical leave. However, an employee may elect to use any paid family, vacation, personal, or compensatory leave, provided by an employer for family leave, or any medical or sick leave provided by an employer for medical leave. The DCFMLA does not require an employer to permit an employee to use annual, personal or vacation leave for medical leave. D.C. Official Code §§ 32-502 and 32-503 (2001 Ed.).

There are two (2) types of claims available under the DCFMLA--entitlement and retaliation. Based on the theory that FMLA leave is an entitlement, an employee may bring an entitlement claim where an employer has unlawfully denied family or medical leave and the employee suffered damage as a result of the denial. D.C. Official Code § 32-507 (2001 Ed.) *Ragsdale, et al v. Wolverine World Wide, Inc.* 122 S.Ct. 1155, 1161 (2002); *Miller v. AT&T*, 60 F. Supp. 2d 574, 577 (S.D.W.V. 1999); *Vasconcellos v. Cybex Int'l, Inc.*, 962 F. Supp. 701, 706 (D. Md. 1997).[9] The other type of claim is based

---

[9] The DCFMLA was enacted in 1990 and the federal FMLA was enacted in 1993. Although the DCFMLA preceded the federal FMLA, the statutes are substantially similar. While the OHR is not bound by the legal decisions interpreting the latter statute, those decisions may be considered persuasive authority. *Lenaerts v. District of Columbia Dept. of Employment Svs.*, 545 A.2d 1234, 1238 (D.C. 1988). Given the similarity of

Case 1:06-cv-00695-RMC    Document 13-2    Filed 08/01/2006    Page 11 of 20

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 11 of 21

on the theory that an employer may not discriminate, in the form of retaliation, against an employee who asserts a right under the FMLA. As a result, such claims are analyzed similar to Title VII retaliation cases.

Because Complainant neither explicitly nor implicitly specifies which of these DCFMLA claims applies to her claim with the OHR, the OHR, *sua sponte*, analyzes the merits of both such claims.

### A. Respondent Did Not Unlawfully Deny Complainant Entitlement to the Benefits of the DCFMLA.

In order for the employee to prevail in her entitlement claim, where the employer denies family or medical leave, she must prove that: (1) she (or a member of her family) had a serious health condition; (2) her (or her family member's) condition rendered her (Complainant) unable to perform the functions of her job; (3) she provided her employer with reasonable notice of her need to take leave and the reasons for doing so; (4) the employer wrongfully denied the leave; and (5) she suffered a legal injury as a result of the denial, i.e., the employee lost compensation or benefits by reason of the denial. D.C. Official Code § 32-507 (2001 Ed.); *Ragsdale,* 122 S.Ct. at 1161; *Miller,* 60 F. Supp. 2d at 577; *Pendarvis v. Xerox,* 3 F. Supp. 2d 53, 55 (D.D.C. 1998).

A serious health condition includes "a physical or mental illness, injury, or impairment that involves: (A) Inpatient care in a hospital, hospice, or residential health care facility; or (B) Continuing treatment or supervision at home by a health care provider or other competent individual." *Harrison,* 678 A.2d at 576, n.10; D.C. Official Code § 32-501 (9) (2001 Ed.).

As mentioned in the third element, an employee is required to give an employer reasonable notice of the need for FMLA leave. 4 DCMR § 1608. If an employee had or reasonably should have had at least thirty (30) days notice of the need for Family or Medical Leave, the employee shall notify the employer of his or her intention to take Family or Medical Leave at least thirty (30) days before the employee wishes the leave to begin. 4 DCMR § 1608.1. If an employee could not reasonably have foreseen the need for Family or Medical Leave at least thirty (30) days in advance, the employee shall notify the employer of the need for leave as soon as possible prior to the date on which the employee wishes the leave to begin. 4 DCMR § 1608.2. The employee need only provide the employer with enough information to put the employer on notice that FMLA-qualifying leave is needed. *Stoops v. One Call Communication,* 141 F.3d 309, 312 (7th Cir. 1998).

**Complainant Does Not Establish that She Provided Respondent with Reasonable Notice of Her Need to Take Leave under the DCFMLA, and the Reasons for Doing So.**

---

the statutes, and the dearth of cases interpreting the DCFMLA, the OHR finds cases from the federal courts interpreting the federal FMLA to be persuasive authority.

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 12 of 21

First, Complainant establishes that a member of her family suffers from a serious health condition, namely her mother (to whom the OHR also refers as the "Patient" above and below). Complainant proffers evidence that her mother's condition requires "[c]ontinuing treatment or supervision at home by a health care provider or other competent individual." Specifically, according to documentation from her mother's psychologist, the Patient's condition renders her permanently incapacitated. As a result, the document provides that the Patient: 1) will be ongoing treatment for the remainder of her life, requiring "regular psychiatric and medical follow[-]up with, at [a] minimum, monthly visits to each of her [medical] providers...." This document further provides that even though the Patient will have caregivers during the initial 30 days, the Patient will require intermittent care thereafter...as the Patient's health deteriorates, or as "specific medical issues [may] arise."

Second, the OHR finds that Complainant's mother's condition renders Complainant unable to perform the functions of her job. According to Complainant, and the documentation that she submits from her mother's psychologist, her mother is re-locating to South Carolina, and will establish a treatment regimen with her treating physician(s) there. Specifically, in light of the Patient's condition, and relocation, the document states that "her daughter's [i.e., Complainant's] presence is required to ensure that...[the Patient] transitions into necessary and appropriate medical supervision." As such, the document provides that Complainant's presence "definitely will provide psychological comfort to the Patient[,] which is essential to her [i.e., the Patient's] successful transition and to prevent [a] relapse." The OHR reiterates that the document provides that even though the Patient will have caregivers during the initial 30 days, the Patient will require intermittent care thereafter from Complainant...."

Third, the OHR record discloses that Complainant did not provide Respondent with reasonable notice of her need to take leave and the reasons for doing so. The OHR record discloses that Complainant had or reasonably should have had at least thirty (30) days notice of her need for Family or Medical Leave. Complainant alleges that in late July or early August 2004, it was determined that her mother needed to leave the assisted living facility in which she was residing and move to South Carolina. Complainant subsequently alleges that she needed to take her FMLA Leave beginning on August 30, 2004, or August 31, 2004 at the latest, roughly a month after she learned that she needed to take FMLA Leave. Complainant insists that she informed Respondent orally as early as late July 2004 that she needed to take leave to care for her ill mother beginning on August 30, 2004, or August 31, 2004 at the latest, thus placing her within the thirty (30) days requirement.

However, Complainant submits no documentation to buttress her stance that she orally informed Respondent of her need to take leave to care for her mother in late July or early August 2004, i.e., thirty (30) days before her leave date, August 30, 2004, or August 31, 2004 at the latest. Rather, Complainant merely states that she spoke to her, i.e., Respondent's, Project Manager, to request leave "soon after" she learned that she needed to take leave to care for her mother, without neither stating an exact date nor, more importantly, proffering evidence to support the existence of this conversation. On the

Case 1:06-cv-00695-RMC    Document 13-2    Filed 08/01/2006    Page 13 of 20

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 13 of 21

contrary, Respondent asserts that Complainant did not request leave to care for her mother until August 11, 2004, roughly ten (10) days (or two (2) business weeks) outside of the thirty (30) days reasonable notice requirement for taking DCFMLA Leave. Complainant further concedes that she did not file a written request for leave to care for her mother until August 11, 2004 and, in her Rebuttal, states that she does not recall the specific date when she allegedly request leave in either late July or early August 2004. As a result, Complainant fails to satisfy the reasonable notice requirement of the third element of her entitlement claim.

### Respondent Did Not Unlawfully Retaliate Against Complainant when She Asserted Her Rights under the FMLA.

To make out a *prima facie* case of retaliation, the employee must demonstrate that: (1) she availed himself of a protected right under the FMLA; (2) her employer took an adverse employment action; and (3) there is a causal connection between the employee's protected activity and the employer's adverse action. *Hodgens v. General Dynamics*, 144 F.3d 151, 161 (1st Cir. 1998).

An adverse action in a disparate treatment or retaliation claim is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *See, Brown v. Brody*, 339 U.S. App. D.C. 233, 199 F.3d 446, 456 (D.C. Cir. 1999) citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1999). In the absence of an action resulting in a diminution of pay or benefits, a Plaintiff must establish the occurrence of an action with "materially adverse consequences affecting the terms, conditions, or privileges of [her] employment. *Brown*, 199 F.3d at 457. An "employment decision does not rise to the level of an actionable adverse action…unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Walker v. WMATA*, 102 F. Supp. 24, 29 (D.D.C. 2000). An action that the Plaintiff establishes as undermining his ability to perform his job satisfactorily, or that threatens his future employment prospects, would be an adverse consequence, and create a material employment disadvantage. *See, Mack v. Strauss*, 134 F. Supp. 2d 103; 2001 U.S. Dist. LEXIS 2341 (D.D.C. 2001).

While an adverse employment action is not limited to a particular type of personnel action, *Cones v Shalala*, 339 U.S. App. D.C. 299, 199 F.3d 512 (D.C. Cir. 2000); *Passer v. American Chemical Society*, 290 U.S. App. D.C. 156, 935 F.2d 322 (D.C. Cir. 1991), not all personnel actions are adverse actions under Title VII. *Brown*, 199 F.3d at 453. Minor changes in work-related duties or opportunities are not actionable unless accompanied by "some other adverse change in the terms, conditions or privileges of employment." *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. 2002). Examples of personnel actions that, without more, are not actionable under Title VII are employee inconvenience, an increased workload, a change in assignments and work-related duties, a lateral transfer or denial of a lateral transfer, temporary designation in a position and the delay of a temporary designation. *Stewart*, 275 F.3d at 1135-36; *Brown*, 199 F.3d at 457; *Mungin v. Katten*, 325 U.S. App. D.C. 373, 116 F.3d 1549, 1557 (D.C. Cir. 1997).

Case 1:06-cv-00695-RMC    Document 13-2    Filed 08/01/2006    Page 14 of 20

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 14 of 21

Neither a negative performance evaluation, false accusation, nor reprimand is an adverse employment action in the absence of some material employment disadvantage. *Stewart*, 275 F.3d at 1137; *Mack*, 134 F. Supp. 2d at 112, citing *Childers v. Slater*, 44 F. Supp. 2d 8, 20 (D.D.C. 1999). Subjective injuries such as damage to an employee's reputation, and public humiliation are not, in and of themselves, necessarily adverse employment actions. *Forkio v. Powell*, 306 F.3d 1127 (D.C. Cir. 2002); *Stewart*, 275 F.3d at 1137; *Mack*, 134 F. Supp 2d at 113, citing *Childers*, 44 F. Supp. 2d at 20. The same is true of mere investigations of an employee, *Mack*, 134 F. Supp. 2d at 114, citing *Yerdon v. Henry*, 91 F.3d 370, 378 (2d Cir. 1996), or workplace ostracism. *Mack* at 114, citing *Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 869 (9th Cir. 1996).

Finally, not "[every employment action] that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). "Mere idiosyncrasies of personal preference are not sufficient to state an injury." *Brown*, 199 F.3d at 339. If the foregoing were the case, any action an "irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Brodetski v. Duffey*, 141 F. Supp. 2d 35, 46 (D.C.D.C. 2001). Moreover, the DCHRA is not intended to be an avenue for "judicial review of business decisions," or for Courts to act as "super-personnel departments." See, *Brodetski*, 141 F. Supp. 2d at 45.

An employee may establish a causal link between his protected activity and the adverse action, i.e., an inference of retaliation, by showing that his employer was aware of his protected activity and that the adverse action occurred shortly thereafter. *Mitchell*, 759 F.2d at 86. The temporal proximity between the statutorily protected activity and the adverse action must be "very close" to establish a causal connection. *Hammond v. Chao*, 383 F. Supp. 2d 47, 59 (D.D.C. 2005) (quoting *Clark County School District v. Breeden*, 532 US 268 (2001). For example, "courts generally have accepted [as a causally sufficient] time[,] periods of a few days up to a few months and seldom have accepted time lapses outside of a year in length." *Davis*, 355 F. Supp. 2d at 352 (quoting *Brodetski*, 141 F. Supp 2d at 35, 43. The *Davis* Court stressed that lengths of time that are far too great, without other evidence, fail to demonstrate a causal link. See, e.g., *Buggs*, 293 F. Supp. 2d at 148-49 (citing numerous cases that support the conclusion that the time separation here between a protected activity and a plaintiff's non-selection for a position is insufficient to support a finding of a causal connection).

If the employee establishes a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. If the employer does so, the burden shifts back to the employee to establish that the employer's articulated legitimate, nondiscriminatory reason is unworthy of credence and pretext for retaliation. *Arthur Young*, 631 A.2d at 354, 361 (D.C. 1993). In order for Complainant to prevail on her claim of retaliation in this forum, the OHR's record must contain credible, probative, and substantial evidence from which a reasonable trier of fact would conclude that the *prima facie* elements of a case of retaliation are present and that no legitimate, nondiscriminatory explanation for the action exists.

Case 1:06-cv-00695-RMC   Document 13-2   Filed 08/01/2006   Page 15 of 20

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 15 of 21

**Although Complainant Satisfies Her *Prima Facie* DCFMLA Retaliation Case, Respondent Articulates a Legitimate, Nondiscriminatory Reason for Its Action.**

First, Complainant availed herself of a protected right under the DCFMLA when she allegedly requested leave to care for her ill mother in late July or early August 2004, later furnishing Respondent with a written request on August 11, 2004. Second, the OHR finds that Respondent subjected Complainant to an adverse action. Respondent "significantly changed [Complainant's] employment status when it terminated her employment on September 22, 2004, thus ending the benefits that Complainant received from employment with Respondent.

Third, the OHR concludes that there exists the inference of a causal connection between Complainant's protected activity and Respondent's adverse action. In the first place, the OHR record discloses that Respondent was aware of the protected activity in which Complainant engaged. Complainant alleges that she informed Respondent of her need to take leave to care for her mother in either late July or early August 2004, subsequently providing Respondent with a written leave request on August 11, 2004. Although Respondent denies knowledge of Complainant's first request in either late July or early August 2004, it acknowledges that Complainant filed a written request for leave to care for her mother on August 11, 2004.

In the second place, the OHR finds that the temporal proximity between Complainant's latter protected activity and Respondent's adverse action is "very close." Complainant and Respondent alike assert that the latter terminated the former's employment on September 22, 2004, only about a month and a half, i.e., "less than a few months," after Complainant filed her written request for leave to care for her ill mother, on August 11, 2004.

Even though Complainant satisfies her *prima facie* DCFMLA retaliation case, Respondent articulates a legitimate, nondiscriminatory reason for its action, which Complainant does not successfully rebut. Respondent argues that it terminated Complainant's employment on September 22, 2004 because she failed to report for work after assuring her Supervisor that she would be there. Respondent's action accords with its SOP, Violations Section, which states that an employee's failure to report to work and not notify his/her supervisor for one (1) day may result in suspension (three (3)- five (5) days) for the first offense and dismissal for the second offense.[10] In her Rebuttal, Complainant disagrees with Respondent's reason for terminating her employment, but in her explanation, neither denies, nor submits evidence to rebut, Respondent's assertion that she assured it that she would report to work on September 22, 2004, but failed to do so. Rather, in her Rebuttal, Complainant merely explains that she failed to report to work

---

[10] Respondent contends that Complainant failed to report to work on August 30, 2004, even though she was scheduled to work on this day, calling in a day later, on August 31, 2004, thus violating Respondent's SOP, which requires its employees to call-in at least four (4) hours in advance. Although Complainant denies this contention, asserting that she left a voice message with Respondent the night before, she proffers no tangible evidence to disprove it.

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 18 of 21

While pretext in the proffered reason for the employment action may, "in appropriate circumstances" justify an "inference" of discrimination, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000), a Complainant is never relieved of the burden of proving "that the employer has unlawfully discriminated." *St. Mary's Honor Center*, 509 U.S. at 514. In fact, judgment as a matter of law would be appropriate for the employer (i) "…if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision…," or (ii) the plaintiff's factual challenge to the employer's articulated reasons was "weak" and there was "abundant and uncontroverted" independent evidence that no discrimination had occurred. *Reeves*, 530 U.S. at 148.

### Albeit Qualified, Complainant Does Not Establish that She Was Meeting Respondent's Legitimate Expectations.

First, Complainant is a member of a protected class, as she asserts that she must care for her ill mother. However, albeit qualified, the Complainant does not demonstrate that she was meeting Respondent's legitimate expectations. The OHR acknowledges that its record contains no evidence to suggest that Complainant was not qualified for her position as Personnel Security Assistant. On the other hand, the OHR record discloses that Complainant was not meeting Respondent's legitimate expectations. Specifically, Respondent contends that Complainant failed to report to work on August 30, 2004, even though she was scheduled to work on this day, calling on a day later, on August 31, 2004, thus violating Respondent's SOP, which requires its employees to call-in at least four (4) hours in advance. Although Complainant denies this contention, asserting that she left a voice message with Respondent the night before, she proffers no tangible evidence to disprove Respondent's contention. More importantly, Respondent insists that Complainant took her leave on her own initiative without Respondent having confirmed its approval of her requested leave. Respondent further maintains that at no time did Complainant provide thirty (30) days) advance notice of her need to take foreseeable leave, along with the necessary medical documentation.

Assuming, *arguendo*, Complainant satisfied the second element, the OHR finds that Respondent subjected her to an adverse action. As indicated above, Respondent "significantly changed" [Complainant's] employment status when it terminated her employment on September 22, 2004, thus ending the benefits that Complainant received from employment with Respondent.

Notwithstanding, Complainant does not demonstrate that membership in her protected class was a substantial factor in Respondent's decision to take adverse action against her. Most notably, the OHR record includes no evidence that Respondent employed "similarly situated" employees outside of Complainant's protected class, namely employees similar to Complainant in "all relevant aspects," such as their respective employment situations and the circumstances generating the allegation of discrimination. Particularly, Complainant submits no evidence that she and any other members of Respondent's Staff had a comparable employment status, and engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or…[Respondent's] response to it." On the other hand, Respondent submits

Case 1:06-cv-00695-RMC   Document 13-2   Filed 08/01/2006   Page 17 of 20

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 19 of 21

documentation of other members of its Staff whose employment it terminated; however, the documentation does not indicate that these employees were similar to Complainant in "all relevant aspects." Specifically, the documentation indicates that these Employees assumed different positions than Complainant; and, although Respondent terminated the employment of one (1) of these Employees for conduct in which Complainant similarly engaged, i.e., neither calling nor showing for work, the documentation sets forth insufficient evidence that Complainant and this Employee had a comparable employment status and engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or...[Respondent's] response to it." Thus, because Complainant fails to establish that Respondent employed "similarly situated" employees outside of her protected class, she fails to demonstrate that Respondent treated such persons more favorably.

Even if Complainant established her *prima facie* disparate treatment case, Respondent articulates a legitimate, nondiscriminatory reason for its action, which Complainant does not overcome. Respondent argues that it terminated Complainant's employment on September 22, 2004 because she failed to report for work after assuring her Supervisor that she would be there. As indicated above, this action accords with the "Violations Section" of Respondent's SOP, which permits dismissal after an employee fails to timely, i.e., at least four (4) hours before, notify Respondent of his or her absence for the second time. As mentioned above, Complainant previously violated this Policy on August 30, 2004 (and arguably on other occasions, according to Respondent). Although Complainant disagrees with Respondent's reason for her termination, in her Rebuttal, she merely explains that she failed to report to work on September 22, 2004 because Respondent's Project Manager assured her that Respondent would approve her leave after she fulfilled its request of providing medical documentation for her mother's condition. However, Complainant neither proffers evidence to disprove Respondent's contention that she failed to show to work on September 22, 2004, after assuring it otherwise; and, the OHR record contains no evidence to substantiate Respondent's alleged approval of Complainant's leave request. Consequently, Complainant does not satisfy her burden of intentional or unlawful discrimination by showing "both that...[Respondent's] reason was false, and that discrimination was the real reason."

Therefore, Respondent did not discriminate against Complainant on the basis family responsibilities (caring for mother) when Respondent allegedly terminated Complainant's employment on September 24, 2004, after Complainant requested FMLA Leave to care for her mother in late July and in early August 2004 and left work from August 30, 2004-September 30, 2004 (temporarily returning on September 24, 2004) for this purpose, but called her Supervisor on September 9, 10, and 17, 2004 to update him on her leave status and to inform him that she would not be able to return until September 30, 2004.

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 20 of 21

## DETERMINATION/CONCLUSION

For the foregoing reasons, the OHR finds:

I. **NO PROBABLE CAUSE** to believe that Respondent unlawfully denied Complainant the benefits of the DCFMLA when Respondent allegedly terminated Complainant's employment on September 24, 2004, after Complainant: 1) requested FMLA Leave in late July and early August 2004, reiterating her request in writing on August 11, 2004; 2) furnished Respondent's Project Manager with documentation for her FMLA Leave on August 27, 2004, upon his request on the prior day; and 3) left work from August 30-September 30, 2004 (temporarily returning on September 24, 2004) to care for her mother, calling her Supervisor on September 9, 10, and 17, 2004 to update him on her leave status and to inform him that she would not be able to return until September 30, 2004; and

II. **NO PROBABLE CAUSE** to believe that discriminate against Complainant on the basis family responsibilities (caring for mother) when Respondent allegedly terminated Complainant's employment on September 24, 2004, after Complainant requested FMLA Leave to care for her mother in late July and in early August 2004 and left work from August 30, 2004-September 30, 2004 (temporarily returning on September 24, 2004) for this purpose.

*IT IS SO ORDERED.*

## RIGHT TO APPLY FOR RECONSIDERATION

Complainant may apply for reconsideration of the NO PROBABLE CAUSE DETERMINATION pursuant to 4 DCMR § 719. The application, along with all supporting documentation, must be submitted in writing to the Director of the OHR **within thirty (30) calendar days from the following date** ___7/19/06___.

Complainant may apply for reconsideration on the grounds of: newly discovered evidence, misapplication of laws, or misstatement of material facts. The request must be based on one or more of these grounds. Newly discovered evidence is evidence that: (a) is competent, relevant, and material; (b) was not reasonably discoverable before the issuance of this Letter of Determination; and (c) would alter the ultimate outcome in this case. The application for reconsideration may be dismissed if the application: (a) is not based on one of the above grounds or (b) is not timely filed. **COMPLAINANT MUST INCLUDE ALL SUPPORTING DOCUMENTATION AND REASONS FOR THE RECONSIDERATION REQUEST IN THE ORIGINAL APPLICATION FOR RECONSIDERATION.** The OHR may forward a copy of any application for reconsideration, along with all supporting documentation, to the other party for a response.

*Vivian M. Woods vs. Eagle Technologies, Inc.*
Docket No.: 05-267-P (N)
Page 21 of 21

If Complainant does not file a request for reconsideration with OHR, this letter constitutes a final decision from OHR.  Complainant has **three (3) years from the date of service of this decision** to file a Petition for Review with the Superior Court of the District of Columbia of the No Probable Cause Determination.

### RIGHT TO SUBSTANTIAL WEIGHT REVIEW

As a Complainant, you have the right to a "Substantial Weight Review" from the U.S. Equal Employment Opportunity Commission ("EEOC").  To obtain a Substantial Weight Review, you must **within fifteen (15) calendar days**, send your written request to: State and Local Coordinator, EEOC, 1400 L Street, N.W., Second Floor, Washington, D.C. 20005.

Sincerely,

Kenneth L. Saunders
Director

Cc:   Law Offices
      Daniels & Green, L.L.C.
      Attn.: Richard C. Daniels, Esq.
      7309 Baltimore Avenue, Suite 217
      College Park, MD 20740-3200

      Ms. Vivian Woods
      1479 3rd Street, S.W.
      Washington, DC 20020

Case 1:06-cv-00695-RMC    Document 13-2    Filed 08/01/2006    Page 20 of 20